IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RHONDA G. JOHNSON, §
§
§
Plaintiff, §
§
v. § CIVIL ACTION NO. H-06-3130
§
CITY OF MISSOURI CITY, §
§
Defendant. §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is defendant the City of Missouri City's motion for summary judgment (Docket Entry No. 35) and supplemental materials (Docket Entries No. 37, 38). The certificates of service attached to the motion and supplemental materials reflect that the City of Missouri City (the "City") served plaintiff Rhonda G. Johnson ("Johnson") a copy of the motion on November 1, 2007, and copies of the supplemental materials on November 5, 2007, and November 28, 2007. Despite expiration of a reasonable period of time, Johnson has not filed, or requested additional time to file, a response to the motion.

Based on consideration of the pleadings, the motion, the supplemental materials, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment (Docket Entry No. 35) and **DISMISSES** this case with prejudice.

### I. Background and Claims

In her first amended complaint (Docket Entry No. 18), Johnson asserts that on October 7, 2004, City police officers unlawfully arrested her at her home for domestic

violence and interfering with a 911 emergency call placed by her daughter. She further asserts that during the arrest, the officers used excessive force by pushing her into their patrol car, causing her to strike her head on the vehicle, and that the officers denied her medical attention for a cut she sustained on her foot prior to the arrest.

Johnson claims that at the time of her arrest, the City had in place official policies or customs that enabled the arresting officers to act with deliberate indifference to her constitutional rights and which tolerated the misconduct of City police officers. She claims that the City failed to train, supervise, and discipline adequately its officers, and that the officers unreasonably seized her, used excessive force, and denied her medical attention. Johnson seeks damages under 42 U.S.C. § 1983 in the amount of $500,000.00 and reasonable attorney's fees.

## II.  Motion for Summary Judgment

A.  <u>Standard of Review</u>

In deciding a motion for summary judgment, the district court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the summary judgment evidence, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir.

2000). All evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996).

> Under Rule 56(e),
>
> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.* (Emphasis added).

This language notwithstanding, summary judgment may not be granted simply because the motion is unopposed. In *Hibernia Nat. Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985), the Fifth Circuit held that:

> A motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule. The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed. Therefore, if the district judge's decision [is] to grant summary judgment solely because of a default, such decision [would] constitute[] reversible error.

*Id.* (citations omitted). Thus, the fact that Johnson filed no opposition to the City's motion for summary judgment does not entitle the City to automatic relief. The Court may, however, accept as undisputed the factual allegations presented by the City in its motion as Johnson did not oppose the motion. *See Eversley v. MBank Dallas*, 843 F.2d 172, 173-74 (5th Cir. 1988).

In its motion for summary judgment, the City argues that there was probable cause to arrest Johnson, that no excessive force was used, that Johnson sustained no injury during the arrest or, at most, only a *de minimis* injury, and that the officers reasonably believed that the alleged cut on her foot did not present a risk of serious bodily harm. The City further argues that Johnson establishes no causative unconstitutional policy or custom or a failure to train, supervise, or discipline the officers. In support of the motion, the City submits arrest records, affidavits, deposition excerpts, letters and governmental complaints filed by Johnson, offense reports, written policies of the City, and an audio copy and transcription of the police officers' audio recording of the actual arrest. The City argues that there are no genuine issues of material fact as to any of Johnson's claims.

The City notes that Johnson received timely and proper notice of the motion for summary judgment, but failed to respond. The City requests the Court to accept as true the factual allegations contained in the motion and grant summary judgment.

B.    The City's Liability Under Section 1983

Johnson sues only the City, and asserts that the violations of her civil rights during her arrest were caused by the officers' exercise of official policies or customs established by the City which enabled the officers to act with deliberate indifference to her constitutional rights. (Docket Entry No. 18, p. 3.) In short, Johnson claims that the officers violated her civil rights in the exercise of official City policies and customs.

4

Essential to Johnson's claim is the existence of an underlying constitutional violation. The Supreme Court has held that "if the [officers] inflicted no constitutional injury. . . it is inconceivable that the [City] could be liable." *Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986). As shown *infra*, the summary judgment evidence does not establish any violation of Johnson's constitutional rights, and her claims against the City fail as a matter of law.

Even assuming that the officers violated Johnson's constitutional rights, the City would be liable only if the officers acted pursuant to constitutionally defective official policies or customs of the City. *See Bd. of the County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403-7 (1997); *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). The City's liability under section 1983 requires proof of three elements: a policymaker, an official policy or custom, and a violation of a constitutional right whose moving force is the policy or custom. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). These three elements are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself. *Piotrowski*, 237 F.3d at 578. An official policy may be either a written policy or "a persistent widespread practice of [municipal] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002). In either event, there must be a link between the policy

5

or custom and the constitutional violation, and the policy or custom must be maintained with an objective deliberate indifference to a constitutionally protected right. *Id.* at 264. A description of the policy or custom and its relationship to the underlying constitutional violation cannot be conclusory and must contain specific supporting facts. *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997). Johnson fails to identify, and the record does not disclose, any such official policy or custom.

C.       Probable Cause for Arrest

Johnson claims that the City violated her Fourth and Fourteenth Amendment rights as her warrantless arrest was made without probable cause. The Court notes that because the criminal charges for which Johnson was arrested were ultimately dismissed, her claim is not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

Under the Fourth Amendment, an arrest is based on probable cause "when the totality of the facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Spiller*, 130 F.3d at 165. Thus, at issue here is whether the record establishes as a matter of law that, in light of the totality of the facts and circumstances within the officers' knowledge at the time of Johnson's arrest, a reasonable person would believe that Johnson had committed the offenses of family domestic assault and interference with a 911 emergency call.

Section 22.01(a) of the Texas Penal Code provides that a person commits the criminal offense of assault if the person:

(1)     intentionally, knowingly, or recklessly causes bodily injury to another[;]

(2)     intentionally or knowingly threatens another with imminent bodily injury[;] or

(3)     intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

Texas state law authorizes a peace officer to arrest a person for assault without a warrant if he has probable cause to believe the person committed an assault resulting in bodily injury to another person and has probable cause to believe that there is danger of further bodily injury to that person. Such authority also applies if the officer has probable cause to believe the person committed an offense involving family violence. TEX. CODE CRIM. PROC. §§ 14.03(a)(2), (4).

Under section 42.062(a) of the Texas Penal Code, a person commits an offense of interference with an emergency telephone call if the individual "knowingly prevents or interferes with another individual's ability to place an emergency telephone call or to request assistance in an emergency from a law enforcement agency" or other applicable agency or facility. Under section 14.03(a)(5) of the Texas Code of Criminal Procedure, a police officer may arrest an individual without a warrant for violation of section 42.062(a) even if the offense was not committed in the presence of the peace officer.

7

In context of the above statutory provisions, the following relevant facts are set forth

in the City's motion for summary judgment:

> [T]he police were summonsed to [Johnson's] home by her daughter on
> October 7, 2004. At approximately 10:52 p.m. on October 7, 2004, Jeronda
> King, [Johnson's] youngest daughter, dialed 911 from [Johnson's] home and
> hung up the phone without comment. Because such events are known to often
> relate to distressed situations, Officers Mario Gehret and Kevin Hubenak of
> the Missouri City Police Department were dispatched to the '911 hang up' call
> at [Johnson's] home at 10:54 p.m.
>
> After knocking on the door, the officers were greeted by [Johnson]. The
> officers immediately informed [Johnson] that someone from [her] house dialed
> 911 and hung up the phone. King then appeared and informed the police
> officers that her mother, [Johnson], assaulted her by grabbing her neck, hitting
> her on the head and throwing her against the wall. The entire conversation
> was recorded on Officer Gehret's car audio system[.]
>
> During this conversation, [Johnson] unabashedly admitted to the officers to
> 'whipping' King for 'taking some things' and cussing her mother. Several
> minutes into the investigation [Johnson] stated 'I ain't afraid of whipping. . .
> beating my child, whipping her as a parent,' and 'I'll say it again. I said I
> don't have a problem with beating a child. . .'
>
> The audio tape of the conversation and the transcription reveals that [Johnson]
> refused to cooperate and argued with officers Gehret and Hubenak during their
> attempt to investigate the assault and 911 interference claims, often
> contradicting herself. [Johnson] first admitted, twice, to beating her child,
> then claimed she did not beat her child. Rather than explain the events prior
> to the officers' arrival, [Johnson] repeatedly instructed the officers to 'do what
> they had to do.' On more than one occasion, [Johnson] accused the officers
> of 'beating children downtown' and she exhibited a general bias toward peace
> officers.
>
> The police report further confirms that [Johnson] refused to cooperate with the
> officers, noting that '[Johnson] was very uncooperative and the only thing she

would say to me is that she had a right to beat her child.'[1]  This Report further indicates [Johnson] was 'belligerent,' 'agitated,' and 'antagonistic' and provided several differing accounts of the incidents that occurred prior to the officers' arrival.

Officer Gehret's statement in his Offense Report confirms King's audio recorded statements.  Officer Gehret noted that:

> Upon arriving home[,] Jeronda advised [,] her mother attacked her by grabbing her by the neck and pulling her down to the floor.  Her mother started punching her in the head and face with both fists.  Jeronda further advised that her mother started to knock down everything that was in her bedroom.  [Johnson] also threw down the TV that was sitting on her desk and then she threw a home stereo speaker at her face and struck her on the right side of her head, close to her forehead.  Jeronda advised this caused a lot of physical pain and she also wanted to press charges against her mother for assaulting her.  Further interview with Jeronda shows she sustained a scratch on the left side of her head where she was struck by the speaker and a scratch on the right side of her throat area.

> Further interview with Jeronda shows she advised her mother she was going to call the police, at which time her mother stood in front of her to keep her from calling the police and then just before closing the bedroom door, [Johnson] advised her daughter, 'I'll kill you if you get those people (the police) in my house again' and then she slammed Jeronda's bedroom door.  Jeronda advised she could not call right away so she waited a few minutes.

Officer Kevin Hubenak, the secondary officer on the scene, similarly described the events of October 7, 2004, noting that [Johnson] admitted several times to 'beating' King that night.  Deposition testimony of Officer Hubenak[] similarly indicates that [Johnson] 'was fairly incoherent.  She was not making a lot of sense in anything she was saying.  She was starting one sentence then stopping and then saying something else,' and that [she] 'wasn't

---

[1]In her deposition, Johnson denied telling the officers that she had "a right" to beat her daughter.

making a lot of sense. She was belligerent and angry. The only thing I recall her specifically saying is that she either enjoyed or had the right to beat to her children.'

The officers further observed that King's room was in total disarray following the struggle between [Johnson] and King. Photographs taken that evening accurately depict the room, in its state of disarray, as well as the injuries to King.

After speaking with both the mother and the daughter, the officers questioned [Johnson's] eight year old son, Louis Jackson, who was the only other witness, about the events that evening. Louis Jackson stated he heard both [Johnson] and King screaming, knocking on walls, and knocking on doors.

After interviewing [Johnson], King, and Louis Jackson about the events of the evening, officers Gehret and Hubenak placed [Johnson] under arrest for family domestic assault and interfering with a 911 emergency phone call.

(Docket Entry No. 35, pp. 4-12, record citations and transcriptions of audio recording omitted.) King specifically informed the officers that Johnson had tried to prevent her from contacting the police. (Docket Entry No. 35, Exhibit A, p. 10.)

The totality of these facts and circumstances within the police officers' knowledge at the time of Johnson's arrest clearly are sufficient for a reasonable person to conclude that Johnson had committed an offense of assault or family violence and interference with a 911 emergency call. Because Johnson's claims have no factual or evidentiary substance, the Court finds that there is no genuine issue of material fact with regard to Johnson's claim that her warrantless arrest violated her constitutional rights. The City is entitled to summary judgment dismissing this claim.

D.    Use of Excessive Force

Johnson complains that the police officers used excessive force by pushing her into the patrol car, causing her head to strike the car or door frame.  Plaintiff's allegations raise a Fourth Amendment claim for use of excessive force during an arrest.  *See Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1776 (2007).  To prevail on her claim, Johnson  must establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive to the need, and (3) that the excessiveness was objectively unreasonable.  *See Graham v. Connor*, 490 U.S. 386, 388 (1989); *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005).

> The following relevant facts are set forth in the City's motion for summary judgment:
>
> At 11:16 p.m. that evening, Officer Mario Gehret hand-cuffed [Johnson] and placed her in the patrol car[.]
>
> During this sequence of events, Officer Gehret led [Johnson] to the patrol car and instructed her five times to have a seat in the patrol car, which she ultimately did.  At no point did [Johnson] ever give any verbal or oral indication that [she] was injured in any manner during this process.  In fact, [Johnson] continued to hold a conversation with one of her neighbors, requesting that the neighbor, identified as Ms. Shirley, take custody of her youngest son, Louis Jackson [,] and care for him while she was transported to jail.

(Docket Entry No. 35, pp. 12-13, record citations and transcriptions of audio recording omitted.)  Further, during the booking process at jail, the booking officer asked Johnson several questions, including whether she was injured or ill, to which she answered, "No." (*Id.*, Exhibit P, p.1.)  A review of the audio recording and transcript of Johnson's placement

11

in the patrol car reveals no instance of any complaint by Johnson that she had been physically pushed into the vehicle, or that she had hit or injured her head. (*Id.*, Exhibit A, pp. 16-21; Docket Entry No. 37, Exhibit A.)

Neither Johnson's administrative complaint against the City, (*id.*, Exhibit R), nor her sworn complaint to the NAACP, complain of use of excessive force or a head injury. To the contrary, Johnson expressly *denied* in the NAACP complaint that she had been injured. (*Id.*, Exhibit V.) In none of the complaint letters she wrote to media, judicial, and municipal personnel, did Johnson complain of excessive force or a head injury. (*Id.*, Exhibits W, X.) Johnson nonetheless insisted during her deposition that her "entire head," left and right, front and back, struck "the brim of the back door" on the patrol car when the officers pushed her into the vehicle. (*Id.*, Exhibit U, pp. 28, 78-79.)[2]

Even assuming that Johnson's head struck the vehicle at some point, the record does not establish that she sustained a cognizable physical injury. In her deposition, Johnson testified as follows:

---

[2] The Court is mindful of the Supreme Court's recent holding in *Scott* that, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 127 S. Ct. at 1775-76 (discussing incontrovertible facts established by police videotape of the underlying incident). The police audio recording of Johnson's arrest and transport into the vehicle reveals no complaint or other verbalization of any injury by Johnson or use of force by the officers. (Docket Entry No. 37, Exhibit A). The audio recording was authenticated by Officer Gehret, (Docket Entry No. 35, Exhibit F, p. 3), and Johnson raises no objection to the recording's authenticity or completeness.

Q.     Now, was your head injured at all?

A.     Yes.

Q.     You had a cut?

A.     No, there was no cut.

Q.     How about a broken bone?

A.     Not to my knowledge.

Q.     Okay.

A.     But I've had X rays.

Q.     And how about, was there a visible bruise on your head?

A.     I don't know.

Q.     Okay.  Then how was your head injured?  Explain that to me.  What injury did you have?

A.     Headaches and just pain.

(*Id.*, pp. 80-81.)

Q.     How long did those headaches last?

A.     I don't know.

Q.     You don't know?  How frequently did you get those headaches?

A.     I don't know.

Q.     Don't know?  Did you seek medical attention after you were released from jail for the headaches?

A.     Yes.

Q.      And who did you seek medical attention from?

A.      Just the pharmacy, the pharmacy.

Q.      Okay.  Which pharmacy?

A.      I use – at the time it was Eckerd's.

Q.      Eckerd's?

A.      Uh-huh.

Q.      Do you know the name of the pharmacist that you spoke with?

A.      No.

(*Id.*, Exhibit Y, p. 9.)

Johnson further admitted that although the jail officials asked her if she was sick or injured, she informed them only of a foot injury, not a head injury.  (*Id.*, p. 81.)  Johnson did not submit, and the record fails to reveal, any medical records, affidavits, deposition testimony, or other summary judgment evidence establishing the duration or severity of the headaches or pain or of any other head injury resulting from the purported use of excessive force.

Even assuming proof of such a physical injury, Johnson fails to show that the injury resulted directly and only from a use of force clearly excessive to the need and objectively unreasonable under the circumstances.  In his summary judgment affidavit, Officer Gehret testified in relevant part as follows:

14

I placed Johnson under arrest for family domestic violence and interference with a 911 emergency call. I placed handcuffs on Johnson's wrist and transported Johnson to my patrol car. Although, at times, Johnson was verbally belligerent and uncooperative, she was not physically combative or resistant during her arrest. I did not exercise any force during Johnson's arrest. Nor did it require the use of force to seat Johnson in the patrol car. At no point did I push Johnson's head against any part of the patrol car, nor did I push Johnson into the back seat of the patrol car in a manner causing her to strike any part of her head against any part of the patrol car. Consistent with the absence of any force, Johnson gave no indication that she had suffered injuries during her arrest or while being placed in the patrol car.

(*Id.*, Exhibit F, p. 2.) The audio recording of Johnson's transport into the police vehicle,

(Docket Entry No. 37, Exhibit A), and the transcription of the audio recording (Docket Entry

No. 35, Exhibit A), reveal the following exchanges:

| | |
|---|---|
| Gehret: | I'm just going to put her in the car. |
| Johnson: | Oh, would you turn my lights off[?] |
| Gehret: | Right over here at this first car, ma'am. |
| Johnson: | [inaudible] |
| Gehret: | The car right here. |
| Johnson: | Let me make sure my little boy gets across the street. |
| Gehret: | We'll take care of that. |
| Johnson: | I need my door locked. |
| Gehret: | We're not leaving right now, ma'am. We're gonna go back in the house for a few more minutes. I just need you to have a seat in the car. |
| Johnson: | Okay[.] |

15

Gehret:         Ma'am.  Right over here.

Johnson:        [To her neighbor:] Excuse me!  Take [my son] from me and take him
                across the street please.

Gehret:         Right here, ma'am.  Have a seat.

Johnson:        Take him to [the neighbor] and lock and close my door.  Tell [the
                neighbor] to lock it for me.

Gehret:         Have a seat ma'am.  Have a seat.

Neighbor:       Which lady?

Johnson:        Right there.

Gehret:         Hang on.  Have a seat.

Johnson:        Please.  Right there, Ms. Shirley.

Neighbor:       [inaudible]

Johnson:        Mm hm.  He's over there in the bed.  Just tell him to go back to bed.
                But lock my door for me.

Gehret:         Okay.  You can go in the house, ma'am. . . Yeah[.]

(Docket Entry No. 35, Exhibit A, pp. 16-17.)

Johnson:        Can someone lock the door for me?

Gehret:         Your daughter is standing there, ma'am.

Johnson:        Oh no, sir, she's on drugs.

Gehret:         Ma'am regardless your daughter lives there.

Johnson:        My lord.  No, she lives with her dad.  She lives with Jerry King, she
                doesn't live there.

16

Gehret:     Well, she's got a bedroom there with all her stuff.

Johnson:    No. . . (tape cuts off).

(*Id.*, p. 21.) No indication of a use of force, excessive or otherwise, is revealed on the audio recording or its transcription, and Johnson voiced no complaints of being forced or physically pushed into the patrol car or that she struck her head on the vehicle. Johnson's claim of being forcibly and intentionally pushed into the vehicle such that her entire head struck the door or frame is "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *See Scott*, 127 S. Ct. at 1776.

Because Johnson's claim has no factual or evidentiary substance, the Court finds that there is no genuine issue of material fact with regard to her claim that the officers violated her Fourth Amendment rights by using excessive force during her arrest. The City is entitled to summary judgment dismissing this claim.

E.     Deliberate Indifference to Serious Medical Needs

Johnson claims that she cut her foot during the altercation with her daughter, (Docket Entry No. 35, Exhibit Y, p. 28-29), and that the officers failed to provide medical care for the injury. The City argues that because Johnson did not face a serious risk of substantial bodily injury, no constitutional deprivation is shown.

To prevail on her claim, Johnson must show that the acts or omissions of the officers constituted deliberate indifference to a substantial risk of serious harm regarding her foot and that physical injury resulted. *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000);

*Hare v. City of Corinth*, 74 F.3d 633, 648-49 (5th Cir. 1996).  To be deliberately indifferent,

an officer must know of and disregard an excessive risk to the person's health or safety.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir.

1999).   In context of the instant claim, Johnson must show that the officers' response

indicated that they subjectively intended that harm occur.  *See Thompson v. Upshur County*,

245 F.3d 447, 459 (5th Cir. 2001).  "It is obduracy and wantonness, not inadvertence or error

in good faith, that characterize the [prohibited conduct]."  *Whitley v. Albers*, 475 U.S. 312,

319 (1986).

> The following relevant facts are set forth in the City's motion for summary judgment:
>
> Upon completion of the investigation, Officer Gehret transported [Johnson] to the Fort Bend County Jail, where she was booked into custody.  At this time Officer Gehret provided a probable cause affidavit, detailing the circumstances surrounding [Johnson's] arrest for family domestic assault and interference with an emergency call.
>
> Notably, the intake form completed upon arrival indicates that [Johnson's] condition upon arrest was 'good.'  [Johnson] was booked into Fort Bend County Jail on October 8, 2004 at 4:06 a.m.  At this time [Johnson] signed a Booking/Record Form indicating that 'I have received the jail rules.  I understand how to obtain medical care while in custody.'  <u>Importantly, considering [Johnson's] claim of denial of medical care in this suit, during the booking process, the booking officer asked [Johnson] several questions, including whether she was injured or ill, to which she answered 'No.'</u>  [Johnson] was released the following day, October 9, 2004, at 3:59 p.m.

(Docket Entry No. 35, pp. 14-15, record citations and transcriptions of audio recording

omitted, original emphasis.)

Further, the audio recording and transcription of Johnson's arrest show that the police officers were aware of Johnson's allegation of a cut on her foot, and that after they looked at her foot, were of the opinion that it revealed only an old injury:

> Hubenak:    Okay. Um, she said that she . . . in one of her stories that she gave me, she said that there was a mark on her that was caused from tonight. It looked like a scar. It looks like an old scar. It doesn't look like a new one.
>
> Gehret:     Okay.
>
> Hubenak:    Um, I couldn't really get anything straight out of her.
>
> Gehret:     Did you touch the scar on her?
>
> Hubenak:    It was small, I mean it's small, like minuscule. She said it was from tonight but it doesn't look fresh.

(Docket Entry No. 35, Exhibit A, p. 18.) In his affidavit in support of the motion for summary judgment, Officer Gehret testified that,

> Prior to transporting Johnson to the Fort Bend County Jail, Officer Hubenak informed me that Johnson claimed to have a cut on her foot. When I asked Officer Hubenak about the cut, he indicated that it appeared to be an old scar, not a fresh cut. Officer Hubenak also informed me that the scar was 'minuscule.' As such, I did not believe that this 'cut' constituted a serious threat of bodily harm to Johnson. Even if this 'cut' was recent, I knew that Johnson would get the necessary medical treatment at the Fort Bend County Jail.

(*Id.*, Exhibit F, p. 2.) In his own affidavit, Officer Hubenak testified that,

> Prior to her arrest, Johnson informed me that she had a cut on her foot. She showed me what appeared to be an old scar, miniscule in size, that did not appear to be fresh. I informed Officer Gehret that Johnson claimed to have a cut on her foot but that it appeared to be an old scar, not a fresh cut. I also informed Officer Gehret that the scar was 'minuscule.' I did not believe that

19

this 'cut' constituted a serious threat of bodily harm to Johnson.  Even if this 'cut' was recent, I knew that Johnson would get the necessary medical treatment at the Fort Bend County Jail.

(*Id.*, Exhibit H, p. 2.)

A review of Johnson's deposition testimony fails to show that her foot constituted a substantial risk of serious bodily harm.  Johnson testified that the cut was "the size of [her] little finger," but she was unable to state whether it was a deep or a shallow cut, or whether it was bleeding "profusely" or "just a little bit."  (*Id.*, Exhibit Y, pp. 30-31.)  Johnson states that following her arrest and booking, Fort Bend County Jail personnel looked at her foot, (*id.*, Exhibit U, p. 81), but provided no "medical attention" (*id.*, p. 30).  She testified that her foot "still had the blood on it" when she was released from jail, and that it was bleeding "actively."  She did not seek medical care, and treated the cut herself with peroxide and an antibiotic ointment.  (*Id.*, pp. 31-32.)

Nothing in the record demonstrates that the officers were aware of, and deliberately ignored, any risk of serious bodily injury to Johnson.  Because Johnson's claims have no factual or evidentiary substance, the Court finds that there is no genuine issue of material fact with regard to Johnson's claim that the arresting officers were deliberately indifferent to her serious medical needs.  The City is entitled to summary judgment dismissing this claim.

F.    Failure to Train, Supervise, and Discipline Police Officers

Johnson asserts that the City failed to adequately train, supervise, and discipline its police officers.  (Docket Entry No. 18, p. 3.)

The City's liability for the failure to train, supervise, or discipline its police officers arises only if it was deliberately indifferent to the rights of persons with whom the officers came into contact. *See Connor v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000); *Pineda*, 291 F.3d at 332. A plaintiff may show that the municipality deliberately chose not to provide adequate training, supervision, or discipline in specific situations, or may rely on a single incident if officers have been placed in recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training, supervision, or discipline. *Brown*, 520 U.S. at 407-08; *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 288 (5th Cir. 2002). Liability cannot be imposed on a municipality under section 1983 unless deliberate action attributable to the municipality itself is the moving force behind a constitutional violation. *Brown*, 520 U.S. at 404; *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998). As already determined, Johnson has failed to show a violation of her constitutional rights.

Even assuming a constitutional violation, Johnson fails to raise a fact issue as to whether inadequate training, supervision, or discipline caused the constitutional violation. Johnson has not alleged specific facts or presented summary judgment evidence linking the alleged lack of training, supervision, or discipline as the cause of any injury, and fails to identify specific additional training, supervision, or discipline the officers should have received that would have prevented any violation of her constitutional rights. *See Pineda*, 291 F.3d at 325.

Nor does Johnson raise a fact issue as to whether there was deliberate indifference on the part of City policymakers.  Assuming a constitutional violation, there is no evidence of knowledge of a pattern of similar incidents or notice of a pattern of similar violations.  *See Estate of Davis v. N. Richland Hills*, 406 F.3d 375, 383-84 (5th Cir. 2005).  Because Johnson's claims have no factual or evidentiary substance, the Court finds that there is no genuine issue of material fact with regard to Johnson's claim that the City failed to train, supervise, and discipline its police officers.  The City is entitled to summary judgment dismissing this claim.

### III.  Conclusion

The motion for summary judgment (Docket Entry No. 35) is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**.  Any and all pending motions are **DENIED AS MOOT**.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on this the 18 day of January, 2008.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

22